IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL ACTION NO. 1:15-CV-46

| | |
|---|---|
| DONNA MAE BROWN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>)<br>Defendant. )<br>) | **ORDER** |

**BEFORE THE COURT** is Claimant Donna Mae Brown's Motion for Summary Judgment (Doc. 13) and Defendant Commissioner's Motion for Summary Judgment (Docs. 15, 16). Claimant has also filed a Response to the Commissioner's Motion. (Doc. 16).

I.   **BACKGROUND OF THE LAW**

The Social Security Administration ("SSA") has established a five-step sequential evaluation process for determining whether an individual is disabled.[1] 20 C.F.R. §§ 404.1520(a) and 416.920(a). If it is determined that a claimant is or is not disabled at one step, the SSA or Administrative Law Judge ("ALJ") will issue a decision without proceeding to the next step in the evaluation. A claimant's residual functional capacity ("RFC") is determined after step three has been completed, but before step four is begun, in order to determine what level of physical

---

[1] 20 C.F.R. §§ 404.1520 and 416.920 articulate the five-step evaluation process: (1) if the claimant is performing substantial gainful activity, the SSA will automatically find that claimant is not disabled at the first step; (2) if the claimant does not have a medically determinable physical or mental impairment, or combination of impairments, that is severe and meets the duration requirement, the SSA will automatically find that claimant is not disabled at the second step; (3) if the severity and nature of claimant's impairment equals one of those listed in 20 CFR 404, Subpart P, App. 1, the SSA will automatically find that claimant is disabled at the third step, or the evaluation will proceed to assess claimant's residual functional capacity; (4) considering claimant's residual functional capacity, if claimant can perform past relevant work, the SSA will automatically find that claimant is not disabled at the fourth step; (5) considering claimant's residual functional capacity, age, education and work experience, if claimant can adjust to perform other work, the SSA will find that claimant is not disabled at the fifth step, or, if claimant cannot adjust to perform other work, the SSA must find that claimant is disabled.

-1-

and mental exertion the claimant can perform at work. 20 C.F.R. § 404.1545(a) and § 416.945(a). The ALJ determines the RFC by assessing claimant's ability to do physical and mental activities on a sustained basis, despite limitations from identified impairments and claimed symptoms that are reasonably consistent with objective medical evidence and supported by other evidence. 20 C.F.R. §§ 404.1529, 404.1545, 416.929, and 416.945.

## II.    STANDARD OF REVIEW

This is a social security disability appeal. The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the Commissioner applied the correct legal standards. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has made clear that it is not for a reviewing court to re-weigh the evidence or to substitute its judgment for that of the Commissioner—so long as that decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456 (4th Cir. 1990); *see also*, *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Hancock v. Astrue*, 657 F.3d 470, 472 (4th Cir. 2012). "Substantial evidence has been defined as 'more than a scintilla and [it] must do more than create a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Smith v. Heckler*, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting *Richardson*, 402 U.S. at 401). Ultimately, it is the duty of the Commissioner, not the courts, to make findings of fact and to resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456. Indeed, so long as the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court disagrees with the final outcome. *Lester v. Schweiker*, 683 F.2d 838, 841 (4th Cir. 1982).

## III. PROCEDURAL HISTORY

On August 13, 2013, Claimant protectively filed a Title II application for a period of disability and disability insurance benefits as well as an application for supplemental social security income. (Tr. 18). In both applications, she alleged an onset date of March 16, 2013. *Id.* She was denied initially and upon reconsideration. *Id.* She requested a hearing which occurred on September 10, 2014 before Administrative Law Judge ("ALJ") Gregory M. Wilson. *Id.* She was accompanied by an attorney. *Id.* Also present was a vocational expert ("VE"). *Id.* On October 31, 2014, the ALJ issued a decision denying Claimant's application for a period of disability and disability insurance benefits. (Tr. 34).

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since March 16, 2013. (Tr. 21). At step two, he found that ALJ had the following severe combination of impairments: left knee degenerative joint disease and status post-total left knee arthroplasty, lumbar pain, facial neuralgia, headaches, diabetes mellitus, hypertension, depression, and post-traumatic stress disorder. (Tr. 21). The ALJ then found that the Claimant did not meet the Listings. (Tr. 21). After considering the entire record, the ALJ assigned Claimant the RFC to lift and carry ten pounds frequently and twenty pounds occasionally; to sit, stand, and/or walk for about six hours in a regular eight hour workday; to occasionally balance, kneel, and crawl; to frequently climb, stoop, and crouch; an ability to handle and finger frequently; with the claimant being precluded from climbing ladders, ropes, or scaffolds; with the claimant having a need to avoid concentrated exposures to hazards; and further limited to simple repetitive work activity at no more than an SVP of 2, with the claimant limited to occasional contact with co-workers and the general public. (Tr. 22). The ALJ found that she could not perform past relevant work, but that there are jobs that exist in significant numbers in the national economy that Claimant could

perform, specifically final inspector, housekeeping, and storage facility rental clerk. (Tr. 33). Given the foregoing, the ALJ found that the Claimant was not disabled. (Tr. 34).

Claimant raises four arguments in her appeal before this Court. The first regards the treatment of Ms. Willey, a certified physician's assistant. The second concerns the ALJ's assessment of Claimant's credibility and use of portions of the medical notes. The third argues that the ALJ's treatment of Claimant's GAF scores was insufficient. The fourth argues that remand is required under *Mascio* because the ALJ proposed an improper hypothetical to the VE. The Court will consider these matters in inverse order.

## IV. IMPROPER HYPOTHETICAL

Claimant argues that, in light of the Fourth Circuit's ruling in *Mascio*, the ALJ's hypothetical to the VE did not adequately account for her mental impairments, particularly her difficulties maintaining concentration, persistence, or pace. The ALJ specifically found that Claimant had moderate difficulties in concentration, persistence, and pace. (Tr. 22).

In *Mascio*, the Fourth Circuit held that an ALJ's hypothetical to a VE, which limited the claimant to unskilled work but said nothing about the claimant's mental impairments, was legally insufficient because it failed to properly account for the claimant's moderate limitations in concentration, persistence, or pace. 780 F.3d at 633. The Fourth Circuit stated that an "ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The court noted that "the ability to perform simple tasks is different from the ability to stay on task," and thus merely limiting the hypothetical to simple or unskilled work was insufficient. *Id.* at 638. Remand, however, is not automatically required when an ALJ fails to explicitly account for concentration, persistence, or

pace limitations in his hypothetical to the VE. *See id.* For instance, "the ALJ may find that the concentration, persistence, or pace limitation does not affect [the claimant's] ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the [VE]." *Id.*

In *Mascio*, remand was necessary because the ALJ provided no explanation at all regarding whether the claimant's limitations in concentration, persistence, or pace affected her RFC. *Id.*

Here, the ALJ appropriately considered Claimant's moderate limitations but found that they do not affect her ability to work beyond the limitations prescribed. The ALJ specifically stated that he gave "great weight" to the opinions of the Disability Determination Explanations of the agency's non-examining physicians who reviewed the record and gave an opinion regarding Claimant's mental RFC. (Tr. 29). In fact, the ALJ stated that these opinions "precisely echo my findings as to . . . concentration, persistence, or pace." (Tr. 29). In particular, these four separate opinions found that while Claimant was moderately limited, she was "not significantly limited" in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual" and "not significantly limited" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." All of these physicians also concluded that Claimant "appears to retain the mental capacity for sustained performance of relatively simple, routine, repetitive tasks." (Tr. 144-46, 161-63, 181-83, 202-04). Further, the ALJ also recounted evidence that Claimant "was reported to have no difficulty understanding, no problem with coherency, [and] no problem concentrating and answering." (Tr. 29).

Here, unlike in *Mascio*, the ALJ discussed substantial record evidence in determining Claimant's mental RFC, and his explicit reliance on the non-examining physicians' opinions adequately explains why Claimant's limitations in concentration, persistence, or pace did not translate into any additional restrictions in the ALJ's hypothetical to the VE. (Tr. 30). Therefore, the Court is not left to guess at the ALJ's decision-making process. *See Mascio*, 780 F.3d at 638 ("Perhaps the ALJ can explain why Mascio's moderate limitation in concentrate, persistence, or pace does not translate into a limitation in Mascio's residual functional capacity."). Thus, Claimant's mental limitations were fully accounted for in the hypothetical used and the RFC assigned.

## V.  GAF SCORES

Claimant also argues that the ALJ failed to properly consider the two Global Assessment of Functioning ("GAF") scores in the record. (Doc. 13-1, at 20).

GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social and occupational functioning." American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 1994) (DSM-IV). A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, familiar relations, judgment, thinking, or mood. *Id.* A score between 41 and 50 indicates serious symptoms, such as suicidal ideation, serious impairment in social, occupational or school functioning. *Id.* A score between 51 and 60 indicates moderate symptoms, such as occasional panic attacks or moderate difficulty in social, occupational or school functioning. *Id.* The American Psychiatric Association dispensed with the GAF scale "for several reasons, including 'its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.'" *Clemins v.*

*Astrue*, No. 5:13CV00047, 2014 WL 4093424, at *7 (W.D. Va. Aug. 18, 2014) (quoting American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (5th ed. 2013)). "Given the questionable probative value of GAF scores[,]" courts within this Circuit have stated that failing to discuss the scores does not, by itself, require remand. 2014 WL 4093424, at *1.

Specifically, Claimant argues that the ALJ misinterpreted what the GAF scores actually indicate. The Claimant had two GAF scores in this case. On September 11, 2013, she was assigned a GAF score of 40 by a licensed professional counselor, Ann Peyssurd of Appalachian Community Services. Tr. 710-13. She spent an hour and fifteen minutes with Peyssurd. *Id.* Claimant reported that she has very bad thoughts, panic attacks, and depression. *Id.* Claimant stated that she had difficulty sleeping; a pain intensity of "9" due to her knee surgery, fibromyalgia, and migraines; and that she has issues with aggression. *Id.* Peyssurd indicated that Claimant was dressed appropriately for the season; was cooperative; had a low energy level and walked with a cane; appeared depressed and anxious; had a flattened affect; and did not exhibit symptoms of hallucination or delusions. *Id.*

Less than a month later, on October 7, 2013, Claimant presented to David Sillars, M.D., of Appalachian Community Services via telepsychiatry. Tr. 803-05. Claimant reported that she had depression and anxiety but had never seen a counselor regularly. *Id.* Claimant reported suicidal thoughts (but no suicidal intent), migraine headaches, problems sleeping, and outbursts of anger. *Id.* The Report of Systems ("ROS") found lack of energy; vision changes; ringing in ears; swelling of feet or legs along with pain in legs while walking; no issues with respiratory, gastrointestinal, genitourinary, integumentary, and hematologic/lymphatic systems; joint pain, aching muscles, swelling of joints, back pain; uncontrolled motions, frequent headaches, problems with walking or balance, and dizziness; changes in sex drive; insomnia, irritability, depression, anxiety, mood

swings, and hallucinations. *Id.* The psychiatric exam found that Claimant was neat, good, and calm. Her affect was appropriate; her mood was depressed, irritable, and anxious/fearful; her judgment was appropriate; she had poor insight; she was alert, well oriented, and had memory, language, and a fund of knowledge within normal limits. *Id.* Sillars assigned Claimant a GAF of 50 and diagnosed her with major depression. *Id.* He prescribed her Seroquel and Wellbutrin and indicated that she would do better with weekly counseling. *Id.*

The ALJ noted the GAF scores of 40 and 50 and correctly indicated that they constitute "medical opinion" under the regulations. Tr. 28. He stated that he did not rely upon the GAF scores as the primary support to determine impairment severity but considered whether these scores are supported by other clinical findings and evidence of record. Tr. 28.

His discussion of the GAF scores is repeated below:

> GAF scores of 40 to 49 usually indicate somewhat severe psychological symptoms. GAF scores of 50 to 60 indicate more moderate symptoms. I assign fairly limited weight to these GAF scores. For one thing, the scores fluctuated by ten points in only one month, seemingly depending a great deal on the individual who happened to make the GAF score approximations. Also, the above GAF scores are inconsistent with the rest of the psychological evidence of record. Over an uninterrupted multi-month period, Ms. Brown told Dr. Davis that she did not suffer from **any** depression, anxiety, or sleep difficulties, as is detailed above. Since the above GAF scores are inconsistent with the observations of multiple other treating sources, I accord these two GAF scores little weight.

Tr. 28.

Claimant argues that the ALJ misclassified the GAF of 50. The Court finds no merit in this argument. Claimant argues that the ALJ classified the GAF score of 50 as "moderate[,]" but, in fact, the sentence reads that the ALJ considered scores of 50 to 60 as "*more moderate*" than scores of 40 to 49. Moreover, the ALJ found other good reasons to assign limited weight to the GAF scores. The fact that the scores fluctuated so much within a single month does tend to show

-8-

that they are highly subjective. Finally, contrary to Claimant's general arguments against the ROS, the ALJ had substantial evidence to conclude that the entirety of the medical record showed a consistent failure to even complain of depression-related issues to her primary caregiver. *See* Tr. 27, 29-30 (ALJ's discussion of additional evidence relating to anxiety and depression). In conclusion, the Court finds that the ALJ did provide good reasons for discounting these GAF scores and acted well-within the internal administrative guidance issued by the Commissioner. *See* (Doc. 13-3) (AM-13066) (providing guidance to ALJs on how to consider GAF scores, but also providing discussion focusing on how GAF scores can be unreliable).

## VI.  TREATMENT OF PHYSICIAN'S ASSISTANT AND CLOSED PERIOD OF DISABILITY

Brown claims that the ALJ inappropriately weighed the opinion of Alexis Willey, a physician's assistant at Sylva Orthopedic Associates. Willey administered five hyalgan injections to Claimant between July 2013 and September 4, 2013. (Doc. 13-1, at 2-3) (citing Tr. 683-87). The purpose of these injections was to relieve pain, decrease inflammation, and increase mobility. Tr. 684-88.

On September 4, 2013, Claimant presented to Ms. Willey for her knee issues. Tr. 681. Willey injected Claimant's left knee with her final hyalgan injection. During the visit, a doctor came into the room and indicated that Claimant should allow three to six months for the knee to respond to the injections. *Id.* Willey gave Claimant a knee brace and Claimant reported that her knee felt better with the brace. *Id.* Willey then stated "[s]he was given a note for work specifying her restrictions. Hopefully she will find a sedentary job that will accommodate her restrictions. . . . Currently the condition is moderate in severity, unchanged and not responding to treatment." *Id.* Willey indicated that Claimant should "[c]ontinue to use ice and elevate the leg as needed for comfort and swelling control. Use the knee brace with activity as needed for stability." *Id.*

The note, also dated September 4, 2013, states that Claimant should be on "modified duty" from April 18, 2013 to December 4, 2013. Tr. 691. Specifically, her modified duty included no prolonged standing; no prolonged walking; no bending, squatting, or kneeling; a requirement to keep her knee elevated three times a day and to ice it three times a day; and to use crutches/walker as needed. *Id.* Claimant was to attend physical therapy twice a week for four weeks. *Id.* Under "provider comments," Willey indicated that "patient needs to be trained for sedentary job that will allow for current restrictions." *Id.* Prior to the issuance of this form, Willey completed two other duty restrictions. Specifically, on June 12, 2013, she stated that Brown was on "modified duty" from June 12, 2013 until July 24, 2013. Tr. 698. This modified duty entailed no prolonged walking on concrete surfaces and no lifting greater than ten pounds. On August 7, 2013, Willey indicated that Claimant was to be on "no duty" from August 7, 2013 to August 21, 2013. Tr. 702.

The ALJ stated that she accorded Wiley's opinions "very little weight" and that the "wording makes it plain that these are **temporary** work restrictions, not permanent ones." Tr. 30. Furthermore, the ALJ appropriately noted that Wiley's was not an "acceptable medical source" under 20 C.F.R. 404.1502 and 416.902. *Id.* The ALJ noted that her opinion must still be weighed. *Id.* The ALJ stated that "[i]t appears that Ms. Willey's assessment of the claimant's back pain complaints were central in these temporary work restrictions. Yet August 2013 lumbar x-rays were negative." *Id.* The ALJ stated that "[a]lthough Ms., [*sic*] Willey made a diagnosis of sciatica, she prescribed no pain medication. Thus, the back pain complaints central to Ms. Wiley's [*sic*] opinions were nebulous, not backed up by objective data, and did not require prescription pain medication." *Id.* Finally, the ALJ reiterated that Willey's opinions regarding work were "temporary in nature and not permanent or open-ended." Accordingly, the ALJ "afford[ed] Ms. Willey's work restrictions very limited weight." *Id.*

Willey is a physician's assistant, meaning her opinions are not afforded the same treatment as an "acceptable medical source." 20 C.F.R. § 404.1513, § 404.1527(a); SSR 06-03p. However, "[a]s with opinions from physicians and psychologists, the ALJ must explain the weight given [to] opinions of other sources and the reasons for the weight given." *Pope v. Colvin*, No. 5:14-CV-473-D, 2015 WL 9898578, at *5 (E.D.N.C. Dec. 23, 2015) *rep. & rec. adopted,* No. 5:14-CV-473-D, 2016 WL 236217 (E.D.N.C. Jan. 20, 2016). "[T]he case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." SSR 06-03p. Evidence from Willey can be used to show the severity of an impairment and how an impairment affects a claimant's ability to work. § 404.1513(d).

Claimant's first argument is that the ALJ inappropriately classified Willey's opinion as "temporary" even though she later stated "patient needs to be trained for sedentary job that will allow for current restrictions." Tr. 691. The ALJ had substantial evidence to conclude that the "current restrictions" were temporary in nature because they refer to a temporally limited period of April 18, 2013 to December 4, 2013. Tr. 691; *Kirkland v. Colvin*, No. 1:15CV00086, 2016 WL 126754, at *6 (M.D.N.C. Jan. 11, 2016) ("Ms. Grimsley's use of the word "[c]urrently" indicates that, although Plaintiff suffered limitations at that time, they did not stem from an impairment of long-standing or expected permanency."). This is buttressed by the fact that a doctor indicated that she would respond to treatment within three to six months, Tr. 681, which is within the range of the note that Willey provided. Moreover, while Willey appears to be indicating that Claimant would be on modified duty from April 2013 until December 2013, Willey only signed the form in September of 2013. Her backdating directly contradicts her earlier modified duty forms. The temporary nature of her opinion by itself justifies the ALJ's

-11-

finding that it should be accorded very little weight. Accordingly, this assignment of error does not justify remand.

Claimant also argues that the ALJ focused on the negative lumbar x-rays but that this does not "erase" Willey's finding that she has tenderness to palpation over her spine and right sciatic notch on August 7, 2013. Tr. 658. The ALJ directly considered this treatment note. Tr. 24. The ALJ indicated that she did not prescribe pain medication but rather recommended physical therapy. *Id.* Claimant states that the record substantiates the she was receiving pain medication at the time. Regardless, the ALJ considered all evidence regarding her alleged lumbar issues (Tr. 24) and had substantial evidence to conclude that her lumbar pain was not disabling. Claimant states that the ALJ's treatment of Willey does not render irrelevant limitations related to her knee impairment. (Doc. 13-1, at 13). However, the ALJ extensively considered her knee impairment and her credibility regarding her allegations of pain that purportedly stem from her knee issues. (Tr. 23-24, 30-31). The Court finds that the ALJ adequately considered her allegations of pain stemming from her knee impairment and had substantial evidence to support his treatment of the temporally limited opinion of Willey. The ALJ concluded that Claimant was not entirely credible regarding her allegations of pain stemming from her knee issues and substantial evidence supports this finding.

Claimant also argues that the ALJ failed to consider a closed period of disability. This argument is presented in a short four sentences stating that she is entitled to a closed period of disability between March 16, 2013 and a "reasonable recovery period" after her January 20, 2014 surgery. (Doc. 13-1, at 14). A decision denying benefits implicitly finds that a claimant is not entitled to a closed period of disability within the same period. *Atwood v. Astrue*, No. 5:11CV002-RLV-DSC, 2011 WL 7938408, at *6 (W.D.N.C. Sept. 28, 2011) *rep. & rec.*

*adopted,* No. 5:11-CV-00002-RLV, 2012 WL 1858764 (W.D.N.C. May 22, 2012). Importantly, the ALJ directly considered this period finding that "[e]ven before Ms. Brown's knee replacement surgery, she repeatedly denied to Dr. Davis that she had gait difficulties." Tr. 21, 23. Moreover, the ALJ noted that objective evidence showed that even before the knee replacement surgery, her osteoarthritis in her left knee was mild and swelling was mild. Tr. 24; *see also* Tr. 881 (indicating that four days before Claimant's knee replacement her knee was tender but had a full range of motion); Tr. 895 (indicating that Claimant had a full range of motion upon discharge). Finally, Claimant did not even begin to report her alleged back issues until August 7, 2013. Tr. 24. Accordingly, the Court finds that substantial evidence supports the entirety of the ALJ's opinion denying benefits.

## VII. REVIEW OF SYSTEMS

Claimant argues that the ALJ inappropriately cited to the ROS throughout the opinion. Specifically, Claimant states that the ROS "are clearly unchanged, computer-generated findings that are carried forward throughout the medical records, without review or actual adoption by the signing physician." (Doc. 13-1, at 17). Claimant states that "[a]ny reasonable and fair review of the records shows the unchanged information in select portions of Dr. Davis's records did not contain an accurate account of Brown's condition." (*Id.* at 15). The Court notes that ROS information did not remain unchanged. *Compare,* Tr. 836-39 (admits knee pain; denies joint pain, joint swelling, muscle pain, joint stiffness) *with* Tr. 863-65 (admits joint pain, knee pain; denies joint swelling, muscle pain, joint stiffness); Tr. 967-69 (admits joint swelling, knee pain; denies joint pain, muscle pain, joint stiffness). Further, Claimant admits that "the file contains no explanation from Dr. Davis that" he misrepresented that he performed a ROS on medical records he submitted to the Commissioner. (Doc. 13-1, at 17). Further, Dr. Davis adopted the

ROS portion of his medical records when he signed and presented them for use in these proceedings. Accordingly, the Court finds no basis to conclude that this portion of the medical record was simply carried over from each visit to the next.

"A review of systems is a screening tool that relies on a patient's verbal history and consists of an inventory of the body systems." *Spurlock v. Astrue*, No. 3:12-CV-2062, 2013 WL 841474, at *26 n. 11 (S.D.W. Va. Jan. 28, 2013) (citing McGraw–Hill Concise Dictionary of Modern Medicine. © 2002 by The McGraw–Hill Companies, Inc.) *rep. & rec. adopted sub nom. Spurlock v. Asture*, No. CIV.A. 3:12-2062, 2013 WL 841483 (S.D.W. Va. Mar. 6, 2013). When a ROS is conducted, "the medical provider poses to the patient a series of questions, arranged by organ system, that are designed to elicit the patient's signs and symptoms and uncover dysfunction or disease. The review of systems does not represent the medical provider's diagnosis, but provides information useful in making that assessment." *Id.*

ALJs are well within their right to rely upon the ROS to determine whether or not a person responded affirmatively to a question designed to elicit whether the person subjectively believes he or she has an issue with a particular system. This is especially so when the standard of review is substantial evidence and the person denies, as in this case, an issue entirely unrelated to the purpose of the visit. *See* Tr. 24 (denial of muscular pain when seeing doctor for knee issues); Tr. 25 (denial of headaches); Tr. 26 (denial urinary frequency, excessive sweating, unusual fatigue); Tr. 27 (denial of depression over extended period). The ROS is part of the medical record and, in the case of a claimant's primary care provider, can provide a record of the specific complaints a patient has over a period of time. *See* 20 C.F.R. § 404.1527(c)(2). Claimant provides two examples of medical records. On the first, the ROS indicated that Claimant "denies joint swelling[,]" but the physical findings included "2+ effusion." (Doc. 13-1,

at 18) (citing Tr. 965). On the second, the ROS indicated that Claimant "denies joint swelling[,]" but that Davis's physical findings include "moderate swelling." *Id.* (citing Tr. 955). The ALJ recognized the distinction between the physical finding of swelling and the denial of swelling when questioned, because he explicitly stated that "[a]n examination of Dr. Davis's records shows that postoperatively, on 6 separate occasions, the claimant **denied** any knee area swelling." (Tr. 23).

In his credibility determination, the ALJ appropriately considered Dr. Davis's records in determining that Claimant did not consistently complain of swelling. Claimant's attempt to bootstrap a credibility argument relating to the ROS portion of the medical record is not well taken. A reasonable mind could utilize the ROS portion of the medical record as a method of determining whether or not Claimant complained about a specific system over a period time. Moreover, there is no indication that the ROS portion of the medical record is "clearly incomplete" or that it was auto-generated. *See* (Doc. 13-1, at 18-20). Accordingly, it would subvert the standard of review to infer that Dr. Davis did not perform the ROS portion of his medical record when the ALJ found that he did so. The ROS is designed to uncover subjective complaints in particular systems. The ALJ was within his authority to utilize the ROS portion of Dr. Davis' records to weigh Claimant's subjective allegations of pain and limitations stemming from her impairments. Given the foregoing, this Court may not reweigh this evidence and come to a contrary credibility finding. *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001).

Accordingly, the Court finds that substantial evidence supports the ALJ's treatment of the medical record. The ALJ had substantial evidence to conclude that Claimant's failure to report issues under the ROS supported a conclusion that the pain and complications resulting from said issues were not as debilitating as alleged.

**IT IS, THEREFORE, ORDERED THAT**

(1) Claimant's Motion for Summary Judgment is **DENIED**;

(2) The Commissioner's Motion for Summary Judgment is **AFFIRMED**;

(3) The final decision of the Commissioner is **AFFIRMED**; and

(4) The Clerk is directed to close the case.

**SO ORDERED**.

Signed: March 31, 2016

Richard L. Voorhees
United States District Judge